Elizabeth Hunt (5292)
Elizabeth Hunt LLC
569 Browning Avenue
Salt Lake City, Utah 84105
Telephone: (801)461-4300
E-fax: 1-801-443-1980
E-mail: Elizabeth.hunt@comcast.net

Andrew H. Parnes (Idaho State Bar #4410)
*Pro Hac Vice*
P.O. Box 5988
Ketchum 83340
Telephone: (208)726-1010
Fax: (208)726-1187
E-mail: Aparnes@mindspring.com

IN THE UNITED STATES DISTRICT COURT
FOR UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           RESPONDENT,<br><br>v.<br><br>FRANCES M. FLOOD,<br><br>           PETITIONER. | REPLY MEMORANDUM SUPPORTING<br>MOTION TO VACATE AND SET ASIDE CONVICTIONS AND SENTENCE UNDER 28 U.S.C.A. SECTION 2255<br><br>    CASE NO. 2:11-CV-00960-DB<br><br>    JUDGE DEE BENSON |

Frances M. Flood, by and through counsel, hereby submits this reply memorandum supporting her motion to vacate and set aside her convictions and sentence.

<u>INTRODUCTION</u>

Subsection (b) of 28 U.S.C.A. § 2255 states:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

The Tenth Circuit interprets the statute as requiring an evidentiary hearing unless the record as a whole demonstrates that the petitioner is not entitled to relief. <u>See</u>, <u>e.g.</u>, <u>United States v. Galloway</u>, 56 F.3d 1239, 1240 n.1 (10th Cir. 1994).

As is demonstrated further herein, Flood's petition and appendix and the record as a whole do not reflect "conclusively" that she is entitled to no relief. Nor has the Government argued or established that she is conclusively unentitled to relief. Accordingly, an evidentiary hearing is in order. The Court is requested to grant the motion for discovery, which will soon be filed, and to set the matter for an evidentiary hearing once Flood has had an opportunity to gather necessary evidence through the discovery process.

I.   THE SIXTH AMENDMENT REQUIRES REVERSAL IF COUNSEL LABORED UNDER AN ACTUAL CONFLICT OF INTEREST THAT ADVERSELY IMPACTED THEIR PERFORMANCE.

The Sixth Amendment provides the accused with the right to the "Assistance of Counsel for his defence." This right is essential to the fairness of criminal trials and the reliability of the verdicts in our adversary system. <u>See</u>, <u>e.g.</u>, <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984).

When criminal defense lawyers operate under a conflict of interest, they breach "the duty of loyalty, perhaps the most basic of counsel's duties." Strickland v. Washington, 466 U.S. 668, 692 (1984). Courts have recognized that a lawyer has an actual conflict of interest when the lawyer's interests diverge from the client's as to a course of action or a material factual or legal issue. E.g., United States v. Schwartz, 283 F.3d 76, 91 (2d Cir. 2002). An actual conflict exists when a lawyer is required to make choices promoting interests that are detrimental to his client's. United States v. Alvarez, 137 F.3d 1249, 1252 (10th Cir. 1998).

Conflicts of interest derogate the entire adversarial process in ways that may not be reflected on the face of the record, from trial preparation, to plea bargaining, to formulation of trial strategy, to trial performance, and so on. See, e.g., Holloway v. Arkansas, 435 U.S. 475, 488-91 (1978) (involving representation of multiple clients by one lawyer). The right to conflict-free counsel is particularly important in conspiracy cases, because the rules of evidence and prosecutorial latitude that prevail in this context may operate unfairly against an individual defendant. See, e.g., Glasser v. United States, 315 U.S. 60, 76 (1942).

Because of the deleterious effects of conflicts of interest on the performance of criminal defense lawyers, if a court is aware or reasonably should be aware of a potential conflict of interest, it has a duty to inquire into it. See, e.g., Cuyler v. Sullivan, 446 U.S. 335, 346 (1980). If the court fails to inquire and the lawyer actively represents conflicting interests which adversely impact the attorney's performance, reversal is required without analysis of evidentiary prejudice often required by

Strickland v. Washington, 466 U.S. 668 (1984). Cuyler, 446 U.S. at 348-50.

Traditional harmless error analysis does not apply to Sixth Amendment violations that pervade criminal cases. See, e.g., Satterwhite v. Texas, 486 U.S. 249, 256 (1988). Prejudice is presumed in the conflict of interest context because lawyers have the professional obligation to avoid conflicts of interest and because courts have the ability to inquire into such conflicts. Strickland, 466 U.S. at 692 (citing Fed. Rule Crim. Proc. 44(c)). Finally, prejudice is presumed because conflicts borne by defense counsel often influence lawyers to refrain from doing things which would dis-serve the conflicting interests. Thus, the record is often lacking in evidence as a result of the conflict, thereby obfuscating a traditional evidentiary prejudice inquiry. See, e.g., Holloway v. Arkansas, 435 U.S. 475, 488-91 (1978).

In Mickens v. Taylor, 535 U.S. 162 (2002), the Court clarified that "actual conflict of interest," which requires automatic reversal, is established if "'counsel [were] influenced in [their] basic strategic decisions by the interests of the employer who hired [them]'" or if a conflict of interest adversely affected that attorney's performance. Mickens, 535 U.S. at 172, quoting Wood, 450 U.S. at 170-72. As examples of adverse effect, the Court referred to a lawyer's failing to cross-examine an adverse witness or failing to object to inadmissible evidence. Id. Under the pre-Mickens law of the Tenth circuit, "defense counsel's performance [is] adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests." United States v.

## II. THE GOVERNMENT MISREADS AND MISAPPLIES THE LAW REGARDING CONFLICTS OF INTEREST.

The Government argues that ClearOne's financial interest in seeing Flood convicted were irrelevant because trial counsel did not share that interest but stood to benefit financially if she were acquitted. See Government's brief at 17-19. The law does not require proof of lawyers sharing the interests that conflict with the defendants', but instead requires proof of attorneys serving or being influenced by those conflicting interests. See, e.g., Alvarez, Bowie and Mickens, *supra*. As is demonstrated in Flood's petition and appendix and Point III, *infra*, Flood's trial counsel were influenced by and served ClearOne's interests in having Flood convicted. Flood does not attribute ClearOne's interests to trial counsel, as the Government contends, Government memorandum at 20. Rather, she demonstrates in her petition that trial counsel were serving and/or influenced by the interests of their employer, ClearOne, which conflicted with Flood's. See, e.g., Mickens, *supra*.

The Government purports to quote Cuyler v. Sullivan, 446 U.S. at 350, as if the case states that "'payment of legal fees by a third party does not automatically rise to the level of a conflict of interest.'" Government memorandum at 14. While the legal proposition stated is correct, the Cuyler case contains no such quotation. It is a

---

[1] In Bowie, the court remanded for a hearing to determine whether a defense attorney's previous representation of a government's witness in a case related to Bowie's gave rise to an actual conflict of interest. 892 F.2d at 1500-02.

case involving two lawyers' simultaneous representation of multiple defendants, not a third party payer.

The Government quotes <u>Hale v. Gibson</u>, 227 F.3d 1298, 1313 (10th Cir. 2000), in asserting, "In order to establish a conflict of interest, 'the interests of counsel and the defendant must be divergent in the current litigation, such that the attorney has an interest in the outcome of the particular case at issue that is adverse to that of the defendant.'" Government memorandum at 19. <u>Hale</u> does contain the language quoted by the Government, but it must be read in context to be understood correctly.

Hale was charged with and convicted of capital murder and sentenced to death, and raised a claim in his 2254 petition regarding his appointed attorney's purported conflict of interest. At the time that the attorney was appointed to represent him, the lawyer filed a letter asking to withdraw from the representation, because the attorney suspected that Hale had previously burglarized his law office. After an unrecorded conference with the judge wherein the defendant was not present, the state court denied the motion to withdraw and voiced the expectation that the lawyer would set aside his suspicions and represent Hale appropriately. The Tenth Circuit affirmed the federal district court's denial of relief in the 2254 petition, relying on the law recognizing that conflicts of interest do not arise from personality conflicts alone. It was in rejecting Hales' claim that an attorney's dislike for a client always gives rise to a conflict of interest that the court stated:

> A conflict does not arise any time defendant and his counsel had prior
> dealings that may have been at odds; rather, the interests of counsel and

defendant must be divergent in the current litigation, such that the attorney has an interest in the outcome of the particular case at issue that is adverse to that of the defendant. See United States v. Soto Hernandez, 849 F.2d 1325, 1329 (10th Cir.1988) (stating that to show conflict of interest, the defendant must demonstrate that counsel "actively represented conflicting interests" in the pending case); see also Beets, 65 F.3d at 1273 (condemning as a conflict the execution of media and literary rights fee arrangements between the attorney and his client during the pendency of a representation but declining to award habeas relief because of a lack of a showing of prejudice).

Id. at 1313. Hale thus is not properly read as requiring proof that a criminal defense

attorney wants to see his client convicted in order to establish a conflict.

The Government's memorandum may be read as intimating that unless a case

involves joint representation of two defendants with conflicting interests, the Cuyler

presumption of prejudice does not apply. See Government's memorandum at 12 n.2.

Such an argument would be erroneous.[2]

Typical conflict of interest cases giving rise to claims of ineffective assistance of counsel involve multiple representation of co-defendants at a single trial. However, a defendant's right to counsel free from conflicts of interest is not limited to cases involving joint representation of co-defendants but extends to

---

[2] The Government's second footnote purports to be quoting Mickens as indicating that "any extension of Cuyler outside of the context of joint representation is 'an open question.'" Government's brief at 12 n.2. This is actually a quote from the second case the Government cites in the same footnote, Hyberg, 2011 WL 1439289 at *6. Hyberg misreads Mickens. Mickens held that a criminal defendant seeking relief for a conflict of interest that the trial court should have known about or did know about would still need to show adverse impact of the conflict on his counsel's performance. Mickens involved a successive representation issue, as the lead trial lawyer whom the juvenile court had appointed for Mickens was the same lawyer the same judge had earlier appointed to represent the victim of Mickens' crime, albeit this was in an earlier case that did not involve Mickens. After affirming the lower court's ruling that Mickens had to show adverse impact from the conflict to prevail, the opinion indicates that the opinion does not address the question of whether the Cuyler presumption of prejudice applies to successive representation cases. Mickens does not state that the application of Cuyler outside the joint representation context is an open question, as the government claims.

any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person.

United States v. Cook, 45 F.3d 388, 393 (10th Cir. 1995).

The Supreme Court has applied the presumption of prejudice to the joint representation of conflicting interests, regardless of whether those interests were held by criminal defendants or third parties. Wood v. Georgia, 450 U.S. 261 (1981), like the instant matter, involved an attorney serving conflicting interests held by the third party payer who employed him.[3] Wood involved probationers whose cases were accepted on certiorari. The Court did not address the issue for which certiorari was granted, but remanded the case to the trial court to inquire into the apparent due process violation posed by the fact that the defendants' lawyer was being paid by the defendants' employer, whose interests were adverse to the defendants' in the probation revocation proceedings. Id. at 264-66. The defendants were convicted of distributing pornography, and the record reflected that their employer had an agreement with the employees to pay attorney fees, bonds, and fines. Id. at 266. The employer honored the agreement to a point, but then did not pay the fines underlying the probation revocation order. The Court suspected that the employer's failure to pay might have been an effort to establish constitutional precedent alleviating the need for the employer to pay the employees' fines in the future. Id. at 267. The Court recognized that the attorney's employment by the defendants' employer may well

---

[3]The Utah Rules of Professional Conduct contain several provisions which proscribe lawyers from representing conflicting interests in most circumstances See Rules 1.7 and 1.8(f) and comments.

have created a conflict of interest that resulted in the lawyer's failure to protect the defendants from probation revocation. Id., 450 U.S. at 267-68 and n.14. The criminal defendants had no conflicts between one another; it was their employer who was paying their attorneys who held interests conflicting with theirs.

The Wood Court recognized the problems caused by third party payment of attorneys, particularly in cases wherein the paying party is the operator of the criminal enterprise, such as when the payer prevents the lawyer from presenting evidence which might be used to defend the accused but which might reflect badly on the payer. Id. at 269-71 and accompanying notes. The Court held that the potential conflict of interest posed by the lawyer's employment by the defendants' employer was sufficiently clear in Wood that the trial court should have recognized it and inquired into it. Id. at 272. This conclusion was premised on the facts that the trial court imposed disproportionate fines with the tacit understanding that the employer would be paying them, was aware that the lawyer was paid by the defendants' employer, and was also aware that the lawyer was pressing a constitutional challenge which would further the employer's business interests, but was failing to zealously protect the defendants in the sentencing and probation revocation proceedings. Id. Also, the Court found that the prosecution's request that the court investigate the potential conflict dispelled any doubt that the court should have been aware of the issue. Id. at 272-73.

The ability of ClearOne, the third party payer of trial counsel, to interfere substantially with Flood's defense and/or to preclude trial counsel from providing

effective representation to Flood in order to serve ClearOne's agenda confirms that Wood applies. While ClearOne was not the "operator of the criminal enterprise" as the Government charged the case, Flood's and Strohm's offenses allegedly occurred while they were employed by and working in an effort to further ClearOne's interests. Depending on trial counsel's strategic choices, their defenses may have implicated ClearOne and its officers and employees, who were involved in the fraud, according to the Government and Court. As the Government conceded in this court, ClearOne had conflicting interests because Flood might have raised defenses harmful to ClearOne (document 165, page 7). Compare Wood, *supra*.

The potential dangers of having the operator of a criminal enterprise funding the defense recognized in Wood pale in comparison to those which came to fruition in this case, wherein the purported victim of the defendants' crimes was committed to both cooperating with the prosecution and funding the defense, but breached its commitment to fund the defense.   Through the ongoing Joint Defense Agreement between ClearOne and the lawyers for Flood and Strohm, ClearOne obtained detailed information from Flood's and Strohm's defense attorneys and then contacted the prosecution with tips on how to prosecute successfully. ClearOne was pushing the prosecution to expedite the trial to avoid defense trial preparation expenses.  ClearOne was pushing Flood's lawyers to settle the case for the same reason.[4]

---

[4] The Government does not contest the allegations in Flood's petition that ClearOne was contacting the prosecutors with suggestions on how to successfully prosecute Flood, and pushing the prosecution to resist continuing the trial.

As the putative victim in Flood's prosecution, ClearOne's abilities to both receive restitution payments and avoid costly and protracted litigation to recoup its perceived damages and the attorneys' fees it paid for counsel for Flood and Strohm hinged on Flood's being convicted.  By refusing to pay Flood's lawyers, ClearOne was able to preclude their effective representation of Flood, to ClearOne's advantage.  As of February 18, 2009, in the midst of the trial that ran from February 2 to February 27, 2009, ClearOne owed trial counsel over $400,000, and, according to trial counsel, was "requiring the law firm to advance trial expenses for witness attendance, experts, etc., to an unreasonable degree, and is depriving Ms. Flood of the benefit of her contractual bargain with the company."  Pursuant to the preliminary injunction, trial counsel was not receiving 40% of the fees, which ClearOne paid into an escrow account.  Trial counsel's contempt pleadings asserted that Flood's constitutional rights would be violated if immediate payment were not made. Flood v. ClearOne,

---

Present counsel for Flood previously requested informal discovery from the Government about these contacts and other issues, but the Government declined to provide discovery until this Court enters an order permitting discovery.  Accordingly, Flood will soon be filing a discovery motion so she has an opportunity to garner the evidence she cannot otherwise obtain that will aid her in proving her claims.

The Government's duty to provide the defendant with exculpatory and mitigating evidence is a continuing one, e.g., Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987), and fairness dictates that the prosecution provide exculpatory evidence to the defendant in post-conviction proceedings.  See, e.g., Monroe v. Butler, 690 F.Supp. 521, 525-26 (E.D. La. 1988).  See also, e.g., Kyles v. Whitley, 514 U.S. 419 (1995) (applying Brady to evidence revealed in post-conviction); Banks v. Dredke, 540 U.S. 668 (2004) (permitting Brady claim to be raised in federal post-conviction despite its not being raised in state post-conviction proceeding).  Cf. Scott v. Mullin, 303 F.3d 1222, 1228 (10th Cir. 2002) (permitting petitioner to raise Brady claim for the first time in federal post-conviction because prosecution had not disclosed exculpatory evidence until after the direct appeal).

document 45, page 3. The Court allowed ClearOne to wait to pay until February 25, 2009, two days before the trial ended, with the escrow provision still in effect. <u>Id</u>. document 46. By ceasing to pay the attorneys and requiring their involvement in the civil suit to obtain fees, ClearOne was able to undermine Flood's overall defense by preventing trial counsel from procuring defense experts, calling essential defense witnesses, preparing, and focusing on her case. <u>See</u> FA 1-7, and the remainder of the 2255 appendix and petition. <u>Compare</u> <u>Wood</u>.

In seeking to distinguish <u>Wood</u>, the Government argues as if ClearOne's only influence was limited to its unwillingness to pay for certain things that trial counsel nonetheless procured. <u>E.g.</u> Government memorandum at 16. Actually, ClearOne consistently withheld hundreds of thousands of dollars in legal fees, resulting in trial counsel's inability to properly investigate and prepare the case, produce expert and other defense witnesses and evidence at trial, and devote their energies to defending Flood in the criminal case. <u>See</u> FA 6-7. The Government's argument fails to recognize or address ClearOne's potential criminal liability, its monitoring of discovery and obtaining other information from trial counsel, or its sharing information with the prosecution to secure Flood's convictions, consistent with its published commitments to cooperate with the prosecution. <u>See</u> FA at 4-7.

When the facts of this case are properly accounted for, <u>Wood</u> applies and demonstrates that Flood is entitled to the <u>Cuyler</u> presumption of prejudice because her trial lawyers were actively representing interests that conflicted with Flood's.

III.  CORRECTION OF THE GOVERNMENT'S FACTUAL ERRORS
      AND OMISSIONS CONFIRMS THAT FLOOD'S TRIAL
      LAWYERS WERE ACTIVELY SERVING MULTIPLE
      CONFLICTING INTERESTS.

      A.  CLEARONE'S INTERESTS AND TRIAL
          COUNSEL'S FINANCIAL INTERESTS
          CONFLICTED WITH FLOOD'S INTERESTS.

The Government suggests that Flood shared ClearOne's interests in conserving

defense costs, as she would be required to reimburse the costs to ClearOne under the

indemnification agreement in the event of a conviction.  Government memorandum

at 21.  The record actually shows that Flood fully funded her defense with the

reasonable expectation that her lawyers would fully defend her constitutional

presumption of innocence.  She paid the equivalent of roughly four million dollars

under the Employment Separation Agreement for ClearOne's commitment to pay

Mr. Wheeler and SCM to represent her (FA 9-14),  "giving up her most valuable

resource that could otherwise have been used to defend herself." (FA 45).  Flood was

not expecting her attorneys to then cut corners in defending her in order to save

ClearOne's money, and thereby risk her current predicament, wherein she is expected

to somehow come up with additional millions of dollars to reimburse attorneys' fees

while she is housed in a federal prison as a convicted felon.

The Government's argument that Flood shared ClearOne's interest in

minimizing her defense costs hinges on its erroneous assertion that it was Flood, and

not ClearOne, who had the obligation to pay SCM's fees.  Government's

memorandum at 20, 25.  SCM had no retainer agreement with Flood for the criminal

case.[5] Trial counsel's entire course of conduct reflected their belief that ClearOne was obligated to pay them (e.g. FA 45).

The Government concedes ClearOne had an interest in Flood's being convicted by virtue of the indemnification agreement. Government memorandum at 18. However, its concession significantly understates ClearOne's interest, as it does not account for the seventeen million dollars in restitution ClearOne sought as the purported victim in the criminal case (FA 36-37). The Government also argues that ClearOne may have had a countervailing interest in Flood's being acquitted by virtue of the insurance suit. Government's memorandum at 18 and n.3. The insurance policy was worth three million dollars, far less than the 17 million dollars in restitution ClearOne sought and the additional millions ClearOne hoped to recoup under the indemnification agreement in the event of Flood's conviction.[6]

---

[5] The Government contends that Flood's retained Max Wheeler and SCM "'to represent her in all matters relating to the SEC investigation and related proceedings.'" Government memorandum at 2. In support of this assertion, the Government quotes dictum in this Court's ruling in the fee dispute case (FA 302). Flood's written agreement with Wheeler and SCM was limited to the "SEC investigation" that ended in 2004 (Government's Exhibit 1). While the Employment Separation Agreement negotiated by SCM did indicate that Flood had retained them "to defend her in the SEC action and Related Proceedings" (FA 9), there was no retainer agreement signed by Flood employing SCM for the criminal case in 2007.

[6] See ClearOne Communications Inc. v. National Union Fire Insurance Company of Pittsburgh, 494 F.3d 1238, 1241 (10th Cir. 2007) (appeal from consolidated cases involving Lumberman's, ClearOne, and National Union, 2:04cv-00119-TC and 2:04cv-00145-TS, remanding for inquiry regarding whether Flood knew or should have known of inaccuracies in financial documents underlying insurance application). There were multiple suits regarding whether the insurance company should pay ClearOne's claim or whether the policy should be rescinded as a result of fraud. Id. Summary judgment had already been granted against ClearOne, and the decision affirming most of the summary judgment ruling had already been

The Government also claims that in suing ClearOne, SCM served the interest they shared with Flood – that she receive "the best defense money could buy." Government memorandum at 29. As explained herein, trial counsel's choice to proceed with the criminal trial before enforcing or at least resolving ClearOne's obligations to fund the defense was a choice made to serve trial counsel's firm's financial interests, rather than Flood's interests. Their decision to proceed in the criminal trial without resolving the funding of Flood's defense conflicted with Flood's constitutional interests in having her defense properly investigated, prepared, and presented with undivided loyalty at the criminal trial (FA 6-7).

Flood's interests did not coincide with ClearOne's and trial counsel's financial interests.

## B. CLEARONE EMPLOYED TRIAL COUNSEL.

The Government argues that trial counsel were hired by Flood, and that trial counsel were not representing ClearOne's interests, as ClearOne had other lawyers representing its interests. Government memorandum at 16, 20. The record unambiguously reflects that trial counsel were employed by, paid by, and had a contract with ClearOne.[7] For example, trial counsel's correspondence in the fee

---

filed at the time of the April 2, 2008, letter from trial counsel. See id. and dockets in case numbers 2:04cv-00119-TC and 2:04cv-00145-TS. After ClearOne was ordered to pay thousands of dollars in attorney fees in the insurance suit, the consolidated suits were ultimately dismissed with prejudice upon the stipulation of the parties in April of 2009, after Flood was convicted by the jury.

[7] Flood hereby proffers, and would testify at an evidentiary hearing should one

dispute case refers to ClearOne's failure to pay their fees as being "in violation of ClearOne's contractual obligations with Ms. Flood <u>and SCM</u>." (FA 45) (emphasis added). Moreover, under <u>Wood</u>, the facts that ClearOne had many lawyers at its disposal and that trial counsel entered appearances on behalf of Flood were not legally dispositive, because ClearOne was the employer of Flood's trial counsel. <u>See id</u>.

C.    CLEARONE'S GOAL WAS TO SUBVERT FLOOD'S DEFENSE, NOT TO SIMPLY INSURE THE REASONABLENESS OF THE ATTORNEYS' FEES.

The Government contends that ClearOne's interest was only to ensure the reasonableness of SCM's fees, and that ClearOne had no ability to direct trial counsel's legal strategy.  <u>E.g.</u> Government memorandum at 16, 19-20.

In the civil fee dispute case, this Court ruled that ClearOne knew that the preliminary injunction was intended to insure Flood's constitutional rights to a fair trial with competent counsel, and that ClearOne acted in bad faith in repeatedly refusing to pay her fees and to comply with that injunction (Flood v. ClearOne, T. 4/16/2009: 11-12).  The foregoing ruling, the Court's repeated comparisons of ClearOne's conduct in failing to pay her attorneys to taking away or taking over Flood's boat when she was in the midst of the ocean (<u>e.g.</u>, <u>Flood v. ClearOne</u>, T.

---

be granted, that when she was employed by ClearOne, the corporation selected and assigned Snow, Christensen and Martineau to represent her.

    As to proffers made herein, counsel for Flood are in the process of obtaining a notarized affidavit from Flood, which they will file upon receipt.

11/12/2008: 6 and 23; 12/23/2008: 15), and the Court's ruling recognizing Flood's valid cause of action for ClearOne's intentional infliction of severe emotional distress are accurate. They highlight the clear factual error in the Government's arguments to the effect that ClearOne's only interest was merely to ensure that Flood's defense costs were reasonable and that ClearOne had no ability to influence her defense.

ClearOne had many interests at play in the criminal case, which were unrelated to the reasonableness of the fees. ClearOne had a financial interest in obtaining roughly twenty million dollars in restitution and recouped attorneys' fees through Flood's convictions. ClearOne and its affiliates were at risk of criminal prosecution before the statute of limitations ran, and were also at risk of and involved in civil litigation as a result of the facts underlying Flood's and Strohm's prosecution. Once it was cast as the victim, ClearOne began publicly committing to cooperating with the prosecution, and was facilitated in this by its power to cut off funding for the defense, and by its access to the discovery and other materials it obtained from trial counsel under the Joint Defense Agreement. ClearOne's counsel represented that there were a number of reasons underlying the decision to cease funding, including pressures from shareholders and a resolution of the board of directors that ClearOne's money was better spent elsewhere (Flood v. ClearOne, T. 9/19/1008: 5; T. 11/12/2008: 28; FA 427, 474). ClearOne's claim that its inability to control the reasonableness of the fees was what prompted the fee dispute contrasted with the 10K ClearOne had filed with the SEC nine days earlier indicating that the fees were reasonable (Flood v. ClearOne, T. 9/19/2008: 7, 10; FA 429, 432).

ClearOne had and exercised the ability to control and subvert Flood's legal strategies by monitoring discovery and other information through the Joint Defense Agreement, making suggestions to the prosecution as to how to prosecute successfully, and ultimately ceasing to fund the defense. ClearOne was apprised by this Court's rulings and by trial counsel's correspondence during the fee dispute of the constitutional rights of Flood, and in bad faith thwarted and defeated Flood's constitutional rights by its nonpayment of fees. After the Court entered the injunction to ensure the reasonableness of the fees it paid, ClearOne continued to subvert Flood's constitutional rights and did not accept the terms of the injunction or comply with it, prompting trial counsel to seek contempt sanctions and file additional pleadings after the injunction issued. See e.g. Flood v. ClearOne docket and T. 4/16/2009: 11-12 (Court ruled that ClearOne knew that the preliminary injunction was intended to secure Flood's constitutional rights to a fair trial with competent counsel, and that ClearOne repeatedly refused to pay her fees and to comply with that injunction in bad faith).

Because ClearOne subverted Flood's ability to defend, and did so in order to serve numerous interests other than ensuring the reasonableness of its fees, the Court should reject the Government's contentions to the effect that ClearOne had no ability to influence Flood's defense and was merely innocuously trying to insure the reasonableness of trial counsel's fees.[8]

---

[8] An order from the Court granting Flood discovery would aid in full illumination of Flood's claims such as this, as currently, the Government and

D.    TRIAL COUNSEL'S EFFORTS TO SAVE CLEARONE'S
      MONEY SHOW THAT COUNSEL SERVED AND WERE
      ADVERSELY IMPACTED IN THEIR PERFORMANCE BY
      CLEARONE'S CONFLICTING INTERESTS.

The Government's contentions that trial counsel properly took steps to save

ClearOne's money, Government memorandum at 20-23, are legally incorrect.  Trial

counsel's efforts to save ClearOne's money during their criminal defense of Flood

constituted active representation of interests that conflicted with Flood's interest in

having her case properly investigated, prepared and presented.  This actual conflict

requires vacation of the convictions under <u>Cuyler</u>, <u>Wood</u>, and <u>Mickens</u>.  The record

provides many specific examples of trial counsel's opting to serve the financial

interests of ClearOne and their own law firm, rather than Flood's constitutionally

guaranteed interests in the preparation and presentation of her defense.

1.    <u>Delegation of Defense Despite Strohm's Conflicting
      Interest and Flood's Lack of Legal Expertise</u>

Lead trial counsel admitted in his affidavit that the defense team delegated the

majority of Flood's defense investigation and preparation to counsel for Strohm, and

also delegated significant portions of this work to Flood herself in efforts to save

ClearOne's money (FA 4-5).  They were thus influenced by and actively serving

ClearOne's financial interests, in violation of <u>Wood</u> and <u>Mickens</u>.

The Government's suggestion that Flood enjoyed a windfall by having

Strohm's lawyers at her service, Government memorandum at 21, does not account

---

ClearOne are in exclusive possession of the evidence regarding their interactions
prior to and during Flood's prosecution.  <u>See</u> n.4, *supra*.

for the fact that Strohm's interests conflicted with Flood's. As discussed in Flood's

petition, this case did involve joint representation of defendants with conflicting

interests, because, in an effort to save ClearOne's money, Flood's lawyers agreed for

the lawyers for Susie Strohm to do the vast majority of the investigation and

preparation of Flood's case, despite the known fact that Flood's and Strohm's

interests conflicted in some respects. Flood's petition at 21-23.[9] Despite the record

indications of this arrangement prior to and during the trial, and despite recognizing

the divergent interests of Flood and Strohm at trial (e.g. V3: 62), the Court never

inquired into the conflict posed by Strohm's lawyers' effectively representing Flood in

the critical area of basic case assessment and trial preparation.[10] But see Federal Rule

of Criminal Procedure 44, Holloway and Cuyler, supra. See also United States v.

Martin, 965 F.2d 839, 843 (10th Cir. 1991) (per curiam) (affirming district court order

granting new trial as a result of inadequate waiver of conflict of interest from dual

representation of co-defendants).

    The Government's argument that Flood's having worked on the defense case

was not shown to be harmful, Government's memorandum at 22, overlooks the fact

---

[9] This aspect of the conflict was detailed in Flood's petition, as it was in the motion for Flood's release pending the 2255 petition litigation, yet the Government has not directly addressed or refuted Flood's contentions in this regard. See, e.g., Government memorandum at 13-14 (suggesting that Flood's case hinges on only two possible theories of conflict: that stemming from SCM's serving of ClearOne's interests and that stemming from SCM's serving its own financial interests).

[10] See Strickland v. Washington, 466 U.S. 668, 687-88, 690 (1984) (recognizing the fundamental duties of criminal defense lawyers to avoid conflicts of interest, to bring their skills to bear to produce reliable results for their clients in our adversary system, and to investigate their client's cases).

that trial counsel did not use Flood's work, and did not duplicate the thousands of hours she put in trying to prepare her defense in this serious and complex white collar case while lacking the legal expertise of her attorneys. See pages 30-31 of Flood's petition.

## 2. Failure to Move to Continue the Criminal Trial

The Government argues that when trial counsel sued ClearOne on Flood's behalf, this served her vital interest in obtaining funding for her defense. Government memorandum at 24-29. In a corresponding argument, the Government notes that the civil suit was brought in Flood's name and intimates that she controlled when the suit was filed. Id. While the idea of Flood controlling the civil suit is disputable, it is not relevant. The relevant problem was that trial counsel proceeded to trial in the criminal case before completing the civil suit or otherwise obtaining the necessary funding essential to defending Flood in the criminal case.

The Government asserts that Flood's criminal attorneys "were not actively involved in the civil case because of concerns that 'there may be a potential for Mr. Wheeler and Mr. Van Wagoner to be witnesses at some point.' FA at 145-46)." Government memorandum at 7. The Government echoes this claim in the argument that Flood was not harmed by the attorneys' proceeding with the civil suit without continuing the criminal trial. Government memorandum at 27-28. Actually, the pages of the transcript quoted by the Government indicate that the possibility of the criminal attorneys' being witnesses was what prompted SCM to involve Mr. Parker in

the civil suit. They do not reflect that the criminal attorneys were "not actively involved in the civil case" as the Government claims. The affidavit of Max Wheeler avers under oath that the criminal defense team were embroiled in the civil suit, and that tremendous amounts of their time, energy, focus and money that should have been devoted to Flood's criminal defense were instead diverted to the fee dispute (FA 5-6). The record of the civil suit similarly shows the significant involvement of the criminal defense attorneys in the civil suit.[11]

The Government notes that trial counsel did not file a motion to withdraw. See Government memorandum at 8. However, it does not account for the Court's intimations that it would convert SCM's fee agreement to a CJA appointment if they

---

[11] They all entered appearances and are all listed on the civil docket as counsel for Flood. They were all listed on the headings and signature lines of the civil complaint filed on August 21, 2008, the motion for summary judgment filed October 8, the memorandum in support of summary judgment filed October 8, 2008, and the emergency motion for contempt hearing filed in the midst of the criminal trial on February 12, 2009. They were all listed on the heading of the memorandum filed on September 11, 2008 opposing a time extension, motion for expedited discovery filed on September 11, 2008, memorandum in opposition to the motion to dismiss filed on October 29, 2008, reply memorandum in support of summary judgment filed November 7, 2008, reply memorandum in support of summary judgment filed December 18, 2008, reply memorandum for emergency contempt filed February 18, 2009, memorandum opposing motion for clarification of injunction filed March 9, 2009, the motion for contempt and supporting memorandum filed April 6, 2009, notice and proposed order filed on April 16, 2009, and reply to counterclaims filed August 28, 2009. Mr. Wheeler signed affidavits in support of memoranda filed on December 18, 2008 and on January 27, 2008. Mr. Van Wagoner and Mr. Harkness attended the September 19, 2008, hearing, the December 23, 2008 hearing, and the January 9, 2008 hearing in the civil suit. Max Wheeler and Sam Harkness attended the November 12, 2008 hearing.

moved to withdraw or to continue the case again.[12] Nor does the Government acknowledge the financial consequences to trial counsel if this conversion had occurred.[13]

The Government notes that Flood did not move for the appointment of CJA counsel.  Id.  Flood had been represented by Max Wheeler since the SEC proceedings began in 2003.  His credentials are impeccable (FA 1-3).  He had the expertise needed for her complex white collar case (e.g. FA 46).  Mr. Wheeler's assessment was that it would be a "real mess" if CJA counsel were appointed (FA 106).  Further,  Flood had paid roughly four million dollars under the Employment Separation Agreement for ClearOne's commitment to pay Wheeler to represent her (FA 9-14).

Despite the conflicts that inhered in her trial lawyers' known arrangements for the co-defendant's lawyers to represent Flood in the critical stages of case investigation and preparation, Petition at 21-23, and despite the recognized fact that Flood's lawyers were pursuing their fees at the expense of their representation of Flood (Flood v. ClearOne, T. 1/8/09: 32-33; FA 291-292), there was no inquiry by the Court to insure that Flood understood and waived the conflicts.  But see, e.g.,

---

[12] See T. 9/12/2008: 24-25, 31-32, FA 109-110, 116-117, Flood v. ClearOne, T. 12/23/2008: 25-27, FA 248-259 and T. 4/16/2009: 8, FA 336; T. 9/19/2008: 24, FA 109.

[13] The bills appended to the complaint in the civil suit indicated that trial counsel for Flood billed at $300, $250, and $200 an hour, and that counsel for Strohm billed at $475 and $325 an hour. In contrast, the CJA rate would have been $100 an hour at the time of the February of 2009 trial.  See http://www.fd.org/odstb_cjahistory.htm.

Cuyler, *supra*.

Conflicts of interest are often difficult for courts and other members of the bar to recognize, even when they are in the midst of them.[14]  Flood, a lay person, is not properly held accountable for the conflicts of interest in her case.  See, e.g., Edens v. Hannigan, 87 F.3d 1109, 1118 (10th Cir. 1996) (discussing judicial duty to discuss facts underlying conflicts with people, and determine if they understand the conflicts and risks of waiving them); United States v. Gallegos, 108 F.3d 1272 (10th Cir. 1997) (courts are to employ all reasonable presumptions against waiver of the right to conflict-free counsel).

In seeking to disprove the existence of conflicts relating to the fee dispute, the Government cites United States v. Ohiri, 2008 WL 2698649 (10th Cir. July 11, 2008) (unpublished).  Government memorandum at 26-27.  Ohiri did not involve a lawyer taking a criminal case to trial without investigating and preparing the case, while necessary defense evidence was missing for lack of funding.  Rather, it involved a defendant who pled guilty and later moved to challenge his pleas on the basis of a purported conflict of interest stemming from his $35,000 debt to his attorney.  The Tenth Circuit recognized that the fee dispute alone did not suffice to establish an actionable conflict of interest, and required the defendant to show that the attorney put his own financial interests above the client's in specific instances.  Id. at  *38. The court found that Ohiri failed to meet this burden with the attorney's affidavit

---

[14] See, e.g., Eldred, "The Psychology of Conflicts of Interest in Criminal Cases," Kansas Law Review, Volume 58, page 43  (2009), available on the Internet at http://law.ku.edu/publications/lawreview/pdf/2_Eldred_Final.pdf.

alleging that:

> (1) Ohiri had paid his firm $41,000 but still owed over $35,000 in fees and costs; (2) he did not retain experts to aid in trial preparation and did not have waste samples tested by independent laboratories because Ohiri could not afford the costs; (3) with the exception of the change of plea hearing, Ohiri at all times denied guilt and was reluctant to plead guilty; (4) he could not remember another case in which he more strongly recommended that a client enter a guilty plea; and (5) if Ohiri's case had gone to trial, he would have requested a continuance because he was unprepared to proceed, having just completed a trial in another matter.

Id. at *38-39. The record showed that the attorney believed it was in Ohiri's best interest to plead and expressed no opinion that Ohiri was innocent or wrongly convicted. It showed that the lawyer was unprepared to proceed with his trial because of his involvement in the other trial, not because of the debt, and that it was Ohiri's inability to pay for the experts and testing, rather than the existing debt, that caused the lawyer to refrain from hiring the experts and obtaining the testing. Id. at *39. On those facts, the court found only a potential for conflict, rather than an actual one.

Flood's case is significantly different, as Flood's lawyers took her criminal case to trial without properly investigating and preparing her case and without the necessary witnesses and evidence, because they opted to try the criminal case before completely resolving whether ClearOne would pay for the experts and evidence needed to prepare and present her case. The fact that SCM negotiated the four million dollar Employment Separation Agreement in such a manner that allowed ClearOne to renege from paying the legal costs and did not have a written retainer for ClearOne or Flood to pay its fees explains why SCM did not move to continue the

criminal trial before resolving the civil suit. Trial counsel leveraged Flood's constitutional rights to present her defense in an effort to obtain the fees they desired, which fees they were very unlikely to obtain in any other way.[15] <u>Ohiri</u> did not involve a joint defense agreement wherein the lawyer was sharing discovery and other information with the alleged victim who had publicly pledged to cooperate with the prosecution. Nor did <u>Ohiri</u> involve an attorney who delegated fundamental case preparation to counsel for a co-defendant with conflicting interests.

<u>United States v. O'Neil</u>, 118 F.3d 65, 72 (2d Cir. 1997), cited at pages 19, 24 and 26 of the Government's memorandum, is inapposite, as it involved a conflict of interest claim premised on the lawyer's having moved to withdraw from representing a criminal defendant and filing suit against him for non-payment of fees. The defendant did not dispute that the fees were owed. <u>Id</u>. at 72. On the facts of that case, the court's observation that the lawyer was more likely to get paid if the client were acquitted was reasonable. <u>See</u> <u>id</u>.[16]

In contrast, the instant matter, trial counsel negotiated the Employment

---

[15] In the November 12, 2008 summary judgment hearing in the civil fee dispute case, the Court opined that ClearOne's bylaws effectively rendered the separation agreement illusory, by allowing non-payment upon the board's determination that ClearOne had insufficient funds, or other places to spend the funds. The Court questioned why Flood's lawyers did not balk at these provisions when Flood entered into the indemnification agreement (Flood v. ClearOne, T. 11/12/2008: 10; FA: 459).

[16] The findings by the court in <u>O'Neil</u> were made after a lengthy evidentiary hearing. 118 F.3d at 70. Flood will soon be filing a discovery motion in order to access to the evidence currently in the possession of the Government and ClearOne, and a subsequent opportunity to present evidence in support of her claims to the Court in an evidentiary hearing.

Separation Agreement which allowed ClearOne to renege on its obligation to pay its fees if the board of directors resolved that ClearOne's money was better spent elsewhere, and prior to trial, the board so resolved. Accordingly, ClearOne quit paying SCM's fees (Flood v. ClearOne, T. 11/12/2008: 4 and 28; FA 154 and 178). Even after the Court ordered ClearOne to pay, forty percent of the fees were held in escrow, and ClearOne did not comply with, but fought, the court order. See docket in Flood v. ClearOne. Trial counsel knew that under the agreement they had negotiated, Flood had paid ClearOne roughly four million dollars in exchange for the indemnification agreement, and had little left to fund her defense (FA 45). SCM could not afford to fund the defense, and their performance was severely harmed by ClearOne's interference and the fee dispute (FA 6-7). Flood's case is thus quite different from O'Neil.

The Government recognizes that Flood's interests required counsel to acquire additional funds to be spent in her defense, but claims that Flood has failed to demonstrate that the "diversion of resources" from Flood's defense resulted from SCM's conflicting interests, rather than ClearOne's breach of its contract with Flood. Government's memorandum at 26, 28. The Government continues its causation argument in footnote 5, claiming that Flood has failed to show a causal link between a conflict of interest harbored by her lawyers and their poor performance at trial. Government memorandum at 28 n.5.

Trial counsel filed multiple pleadings informing the Court that the fee dispute was preventing them from providing effective assistance in preparing to try the case.

This Court repeatedly recognized during the trial, with ample factual bases, that trial counsel's performance was uncharacteristically lacking in preparation and organization.  See Petition at 39-45. This record and the most recent affidavit of trial counsel provide direct causal links between counsel's choice to proceed to trial in the criminal case while the fee dispute and funding for the defense were unresolved, and the attendant adverse consequences to Flood's defense.  See, e.g., FA 1-7.

### 3. Honoring the Joint Defense Agreement

The Government's summary of the Joint Defense Agreement omits those portions that were inconsistent with Flood's interests, such as the paragraphs protecting lawyers from disqualification in any event, and preventing the parties from revealing the shared information unless they were using it against a party to the agreement who opted to testify.  See FA 15-21.

In describing the Joint Defense Agreement, the Government asserts that Flood, Strohm and ClearOne entered into it.  Government memorandum at 2. Actually, Flood and Strohm did not sign the agreement, only the lawyers did (FA 21).

The Government asserts that SCM refused to provide detailed billing records after ClearOne sought them in October of 2007.  Government memorandum at 4. The Government also contends that the "record contains only one instance in which SCM shared information with ClearOne under the Joint Defense Agreement," referring to the April 2, 2008 letter wherein counsel provided internal statistics to support its billing.  Government memorandum at 22.  The Government also

contends that "SCM properly exercised its judgment to determine when disclosure of records served their client's interests." Government memorandum at 23.

Trial counsel's affidavit contradicts these claims, admitting that counsel shared information with ClearOne as much as possible in an effort to get paid, but then worried if the information shared with ClearOne would be used to prosecute Flood (FA 3-5). Further, through the operation of the Joint Defense Agreement, with trial counsel's knowledge and apparent assent, counsel for Strohm provided ClearOne with "some 400,000 pages of documents in electronic format," which did not include "other, extensive documentation already available to ClearOne." (FA 67). Trial counsel's affidavit avers that counsel found information provided pursuant to the Joint Defense Agreement in the Government's discovery (FA 5). See also R. 209-210 (email chain between counsel for Flood and Strohm about ClearOne's using information to aid prosecution). The lawyers for Strohm had provided ClearOne with a great deal of information prior to and after October of 2007 in an effort to get paid (e.g. FA 4, 66-67), and ClearOne continued to seek detailed information underlying the billing through the end of trial (Document 45 in civil fee dispute case, 2:08-cv-00631).

Counsel's continued allegiance to and participation in the Joint Defense Agreement with the purported victim of Flood's crimes and multi-million dollar restitution candidate, and with the co-defendant with partially conflicting interests, all in an effort to get paid by the purported victim, served multiple interests that conflicted with Flood's.

## 4. Use of the Mock Trial to Convince Flood to Plead

The Government claims that trial counsel properly utilized the mock trial to prepare Flood's defense, rather than to persuade Flood to plead and save ClearOne's money. Government's memorandum at 23. The Government's discussion of the mock trial quotes extensively from a letter that was sent to ClearOne discussing the importance of the mock trial in the preparation of the trial. Government's memorandum at 6, quoting FA 56. This letter was copied to Flood, apparently because trial counsel wanted her to believe that the mock trial would be used to prepare her defense. See FA 56. In contrast, the email from SCM to ClearOne discussing the value of the mock trial in reaching ClearOne's goal of settlement of the case and in helping the client to "see things the way they really are" was not sent to Flood (FA 55). Likewise, the letter informing ClearOne that Flood vehemently denied having engaged in fraud (ostensibly privileged information), and intimating that the mock trial might assist in reaching ClearOne's goal of settling the case, similarly was not copied to Flood (FA 59). Flood's petition avers that trial counsel acted as the prosecution at the mock trial and used it to try to persuade her to plead guilty. Petition at 29.[17] The record confirms the truth of this assertion. The mock trial is yet another instance wherein trial counsel were serving the interests of

---

[17] Flood hereby proffers, and would testify at an evidentiary hearing should one be granted, that at the mock trial, Mr. Van Wagoner acted as the prosecutor, counsel for Strohm acted as defense counsel, Mr. Wheeler did not participate but came in after oral argument, and Mr. Harkness came in and out but did not participate. The focus of the mock trial was primarily on Strohm's case. Following the trial, trial counsel tried to use the mock trial and results to persuade Flood to plead. Counsel acknowledged that information Flood had expected to have tested for her defense had not been presented.

ClearOne to save ClearOne's money at the expense of Flood's interests in having her case properly investigated, prepared and presented at trial.

## V.     THE REMAINDER OF THE PETITION JUSTIFIES RELIEF.

The Government does not contest the third point of Flood's petition, alleging that the Court and prosecution violated Flood's constitutional rights by permitting the case to go to trial without resolving the constitutional problems posed by ClearOne's dual status and conduct as the reneging payer of trial counsel and the purported victim of the defendants' crimes.  See Petition at 32-37.  This issue may provide the most efficient means of resolving this case.

The Government contends at the end of its second and fifth footnotes that Flood has not attempted to make a traditional claim of ineffective assistance of counsel.  Government memorandum at 12 n.2, and at 28 n.5  Actually, Flood's petition does raise a traditional claim of ineffective assistance of counsel, petition at 4, details the less than compelling nature of the Government's case at pages 6-11, and later argues that "[t]rial counsel's concessions prior to and during trial that they were not providing Flood with effective assistance (FA 72-84; Flood v. ClearOne, document 45, page 3) are borne out by the record."  Petition at 39.  The Petition then sets forth a detailed argument regarding trial counsel's many instances of ineffective assistance.  Id. at 39-45.  It concludes by asking the Court to grant Flood relief from "ClearOne's interference with and the violation of Flood's rights to conflict-free counsel of choice and to effective assistance in defending against criminal charges[.]"

Id. at 45.

CONCLUSION

The Government has not argued or demonstrated that Flood is conclusively entitled to no relief on the record of this case, as would be required to prevent her from obtaining an evidentiary hearing under 28 U.S.C.A. § 2255 (b). The record before the Court and Flood's petition demonstrate that she is entitled to an evidentiary hearing. Accordingly, the Court is requested to hear evidence in support of her petition, see, e.g., Galloway, *supra*, and to then grant her the relief she seeks.[18]

The Court is requested to reconsider Flood's request for bail pending litigation of her petition in light of the issues now briefed by both parties.

Respectfully submitted this 13th day of February, 2012.

*/s/ Elizabeth Hunt*
Elizabeth Hunt and Andrew H. Parnes

---

[18] Flood seeks the opportunity to present evidence to the Court in a hearing after she has had full access to discovery.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the February 13, 2012, a true and correct copy of the foregoing was filed electronically and caused by be served by electronic notice to all parties listed below: Assistant United States Attorney Diana Hagen.

*/s/ Elizabeth Hunt*